### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

———————————————————————

| | |
|---|---|
| **UNITED STATES ASSOCIATION OF<br>  REPTILE KEEPERS**<br>**508 West 33rd Street**<br>**Jasper, IN 47546,**<br><br> **Plaintiff,**<br><br>**v.**<br><br>**THE HONORABLE DEB HAALAND,**<br>**in her official capacity as the Secretary**<br>  **of the Interior,**<br>**United States Department of the Interior**<br>**1849 C Street, N.W.**<br>**Washington, D.C.  20240,**<br><br> **Defendant.** | **Civil Action No. 1:23-CV-522** |

———————————————————————


### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**Dated:  February 24, 2023**

**Shaun M. Gehan**
**D.C. Bar No. 483720**
**The Law Office of Shaun M. Gehan**
**1101 30th Street, N.W.**
**Suite 500**
**Washington, D.C.  20007**
**Telephone:  (202) 412-2508**

*Attorney for Plaintiff*

## <u>INTRODUCTION</u>

1.      In this civil action, Plaintiff United States Association of Reptile Keepers ("USARK") challenges the adoption by Defendant, the Honorable Secretary of the Interior, Ms. Deb Haaland, of a new wildlife import reporting requirement without procedure required by law. *See* 5 U.S.C. § 553.  Plaintiff have suffered a redressable wrong because of agency action.

2.      This case involves importation and exportation of wildlife that is captive-bred (as opposed to that which has been taken from the wild) in places like the United States, Asia, and Europe, but which is a species native (or "endemic") to a third country which at some point in its history instituted controls or prohibitions on export of its native wildlife for commercial purposes.

3.      For example, there are species of skinks (a type of lizard) that are endemic to Australia which have long been bred in European countries, such as Germany.  In 1999, Australia implemented a law that bars almost all exports of its native wildlife for non-scientific purposes.

4.      At least as early as June 2017, the Secretary's designees at the U.S. Fish and Wildlife Service's ("FWS") Office of Law Enforcement ("OLE") began seizing imported wildlife specimens that meet the criteria in Paragraph 2, demanding that importers produce evidence of a lawful export of specimens' ancestors from the country to which the species is endemic to another foreign nation.  Specifically, proof that the "founder" or "parental" stock of the captive bred animal which originally had been taken from the wild and exported to another foreign country was lawfully so exported.

5.      Such documentation is not required by FWS's duly promulgated regulations governing the importation of captive bred wildlife unless such documentation is required by the

country of export to the United States or if the wildlife is governed by specific provisions of international treaty.

6.      Notably, this new regulatory policy has impacted species that have long histories of being lawfully imported to the United States with FWS' concurrence and which are widely owned and bred in this country.

7.      In all the cases of which USARK is aware, such information has been impossible to obtain, owing to the ubiquity of the species involved in global commercial, zoological, and scientific captive breeding operations over the course of decades, as well as general lack of legal requirements for maintaining such paperwork, either at all or for extended periods, by most nations—including the U.S.—except in certain specific circumstances not applicable here.

8.      Thus, this policy seeks information from U.S. citizens that most often does not exist.

9.      These are the types of issues that could and would be raised during notice-and-comment rulemaking required for adoption any such new import/export documentation regulations.

10.      More recently and for the first time as far as USARK is aware, this policy has been enforced against a U.S. exporter and breeder of reptiles to deny him the ability to export an animal endemic to a country that, at some point in history, adopted wildlife export controls, even though his parental stock had been legally imported with FWS' approval.

11.      This unlawfully promulgated new rule is being applied nationally and to an expanding number of countries.

12.     The development of this new import/export requirement without procedure required by law has harmed USARK and its members through the loss of access to specimens otherwise legally in trade and loss of domestic and foreign business opportunities.

13.     USARK members in academic and scientific fields are being denied the ability to conduct research for conservation, medical, and biological purposes.

14.     This rule also places USARK members in reasonable fear of criminal and civil prosecution for activities that have long been considered legal.

15.     Plaintiffs are harmed by Defendant's actions complained of herein.  This harm will be rectified by a favorable decision by this Court.

## PARTIES

16.     Plaintiff United States Association of Reptile Keepers is a non-profit membership organization representing reptile breeders, hobbyists, conservationists, academics, scientists, and businesses that provide the reptile community with live animals, equipment, feed, transportation, and specialized veterinary and other services.   USARK's mission is to support scientific research, provide public education, and advocate for conservation of all manner of reptile species.   The organization promotes responsible private ownership of, and trade in, reptiles, as well as promulgating and endorsing responsible caging standards, sound husbandry, escape prevention protocols, and an integrated approach to vital conservation issues.   USARK is involved in legal and regulatory advocacy at the federal, state, and local levels on behalf of its members and has previously been found to have standing to challenge agency actions impacting its members and its mission. *See United States Ass'n of Reptile Keepers v. Jewell*, 1:13-cv-2007-RDM (DDC 2015), USARK and its members have been and will continue to be harmed by the illegal actions complained of herein.

17.     Defendant, the Honorable Deb Haaland, is the Secretary of the Department of the Interior.   Defendant, by and through her designees at FWS, undertook the illegal and unauthorized actions which are challenged in this case.   Secretary Haaland is sued solely in her official capacity.

## JURISDICTION AND VENUE

18.     This case arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States"; 28 U.S.C § 2201 (the Declaratory Judgment Act); and the APA, 5 U.S.C. §§ 701-706, which provides that final agency action for which there is no other remedy in a court is subject to judicial review.

20.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, as well as the APA, 5 U.S.C. § 706.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in this district, and 28 U.S.C. § 1291(e)(B), as the Defendant Secretary of the Interior is an officer of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this district.

22.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

23.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

24.     Plaintiff has exhausted all administrative remedies, the agency action challenged is final and ripe for review, and, as shown herein, SFC has associational standing to bring these

claims because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

## STATUTORY AND REGULATORY BACKGROUND

### I.   Administrative Procedure Act

25.   The APA defines a rule at "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency …." 5 U.S.C. § 551(4).   "'[R]ule making' means agency process for formulating, amending, or repealing a rule. *Id.* § (5).

26.   "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § (13).

27.   "Each agency shall separately state and currently publish in the Federal Register for the guidance of the public— substantive rules of general applicability adopted as authorized by law …." *Id.* § 552(a)(1)(D).

28.   Courts generally refer to "the category of rules to which the notice and comment requirements do apply as 'legislative rules' or, sometimes, 'substantive rules.'" *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (citations omitted).

29.   "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."   5 U.S.C. § 552(a)(1).

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**       **Page 6**

30. "General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." *Id.* § 553(b).

31. "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § (c).

32. "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date," subject to some exceptions. *Id.* § (d).

33. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.

34. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

35. "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be— arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [and] without observance of procedure required by law." *Id.* § 706(2)(A),(D).

## II. <u>Convention on International Trade in Endangered Species of Fauna and Flora</u>

36. CITES is an international conservation and trade treaty to which the United States is a party. *See* 16 U.S.C. § 1531(a)(4)(F).

37.     "The aim of CITES is to regulate international trade in wildlife and plants, including parts, products, and derivatives, to ensure it is legal and does not threaten the survival of species in the wild."  50 C.F.R. § 23.1(b).

38.     Defendant Secretary, through her designee FWS, is the Management Authority and Scientific Authority under the CITES Treaty, empowered to "do all things necessary and appropriate to carry out the functions … under the Convention."  *Id.* § 1537a(a),(b),(c).

39.     Under CITES, animals and plants of conservation concern can be listed by vote of the body under one of three Appendices depending on the level of depletion and other factors. Those listed in Appendix I, which includes those of most concern, may be internationally traded "only under exceptional circumstances" and generally not for commercial purposes.  Appendix II contains species "that are not presently threatened with extinction, but may become so if their trade is not regulated."   Appendix III is for species in which a "range country" seeks "international cooperation in controlling trade." 50 C.F.R. § 23.4.

40.     To import or export species listed on one of the three CITES Appendices, one must have a valid CITES document issued by the relevant Management Authority or Authorities. *Id*. § 23.20(c).

41.     The type of documentation and purposes for which trade may be conducted (*e.g.*, commercial, scientific, or conservation) depends on the status of the species and the Appendix under which it is listed.  *Id.* § (d).

42.     Such documentation must contain a "source code" for the specimens being traded that indicates the specimen's type and/or the purpose of the permitted activity, as well as the Appendix on which it listed.  *See id.*; *see also id.* § 23.24 (all source codes).

43.     This case, in part, involves imports and exports of Appendix II and III species that are not otherwise listed or controlled under other laws such as the Endangered Species Act. Such species may be traded in domestic and international commerce for commercial purposes with an appropriate CITES document issued by the Management authority of the exporting nation. *See, e.g.,* 50 C.F.R. § 23.55(e) (uses of otherwise non-restricted Appendix II & III wildlife after import).

## III.     Defendant's Wildlife Importation Regulations

44.     Defendant's designees at FWS have promulgated comprehensive regulations governing the import and export of wildlife through required notice-and-comment rulemaking.

45.     As relevant to this case, the general regulations governing all wildlife trade were last comprehensively amended in 1996, *see* 61 Fed. Reg. 31868 (June 21, 1996), and the last relevant update of the regulations governing trade in species listed under CITES was in 2014. *See* 70 Fed. Reg. 30208 (May 27, 2014).

### A.     CITES Import and Export Regulations

46.     Defendant's regulations implementing CITES specify conditions under which her designee FWS may inquire into the legality of the acquisition of captive bred wildlife's parental stock.   "Parental stock" is defined as "the original breeding or propagating specimens that produced the subsequent generations of captive or cultivated specimens."  50 C.F.R. § 23.5.

47.     For instance, such an inquiry may be proper when CITES requires a Management Authority to make a "legal acquisition finding" with respect to trade in a listed species.  "Legal acquisition refers to whether the specimen and *its parental stock* were: (1) Obtained in accordance with the provisions of national laws for the protection of wildlife and plants.  In the United States, these laws include all applicable local, State, Federal, tribal, and foreign laws; and

(2) If previously traded, traded internationally in accordance with the provisions of CITES." *Id.* § 23.60(b) (emphasis added).

48.     One instance in which Defendant is required to make such a legal acquisition finding is when a U.S. citizen seeks a CITES export, re-export, or a relevant exemption document from Defendant's designee FWS for a species listed under CITES. *See id.* § 23.60(a), (c)(1).

49.     Defendant also purports to reserve the right under certain circumstances to question whether a CITES document issued by a foreign government is valid by seeking to affirm whether the Management Authority of "[t]he Party or non-Party issuing the CITES document has made the required legal acquisition finding." *Id.* § 23.26(c)(9).

50.     The conditions under which Defendant may inquire as to whether a foreign nation made a legal acquisition finding include when FWS has "reasonable grounds to believe that a CITES document is not valid or authentic because the species is being traded in a manner detrimental to the survival of the species or in violation of foreign wildlife or plant laws, or any applicable Management or Scientific Authority finding has not been made." *Id.* § (d)(2).

51.     Importantly, any such inquiry is made to the CITES "Secretariat or a foreign Management Authority," *id.* § (d); *see also* 72 Fed. Reg. 48402, 48416 (Aug. 23, 2007) (same), not by requiring the domestic importer to provide such proof.

52.     Another condition under which Defendant reserves the right to seek verification a lawful acquisition of parental stock by a foreign county is when its designee FWS "has reasonable grounds to believe that the specimen identified as bred in captivity … is a wild specimen [or] was produced from illegally acquired parental stock …." 50 C.F.R. § 23.26(d)(6).

53.     "Bred-in-captivity" is a specialized term referring to Appendix I wildlife that is captive bred in a facility that is recognized by the Management Authority of the country in which it is established and the CITES Secretariat as meeting certain conditions.  *Id.* §§ 23.41, 23.46

54.     Appendix I specimens that qualify as bred-in-captivity for commercial purposes may be traded as if they are listed on Appendix II, meaning they may be traded for commercial purposes and a U.S. resident does not need to obtain an import permit from FWS which would otherwise be required for importing an Appendix I species.  *See id.* § 23.46(a); § 23.41(b)(2).

55.     Concomitantly, when a U.S. applicant seeks to register a domestic bred-in-captivity operation, Defendant requires proof that the "parental stock [to be used in the facility] was legally acquired."  *Id.* § 23.46(d)(2).

56.     Records demonstrating as to whether a specimen or its parental stock was legally removed from the wild is also authorized under Defendant's regulations governing the types of records a U.S. applicant may need to demonstrate the "origin of a specimen" when seeking a U.S. CITES document.  *See id.* § 23.34.

57.     For example, when seeking a CITES document for "wild-collected" specimens, one may be asked to produce records "that demonstrate the specimen or the parental stock was legally removed from the wild under relevant foreign, Federal, tribal, State, or local wildlife … conservation laws or regulations." *Id.* § 23.34(b)(9).

58.     Similarly, for specimens of "ranched wildlife"—defined as "specimens of animals reared in a controlled environment that were taken from the wild," *id.* § 23.5—an applicant may need records "that demonstrate the specimen was legally removed from the wild under relevant foreign, Federal, tribal, State, or local wildlife … conservation laws or regulations."  *Id.* § 23.34(b)(6).

59.     Tellingly, for "captive-bred" wildlife—which are "offspring of parents that either mated or otherwise transferred egg and sperm under controlled conditions … but do[] not meet the bred-in-captivity criteria," *id.* § 23.5, and the category of wildlife most impacted by the parental stock policy at issue in this case—the regulations suggest that records of a legal removal of the parents are only needed "[i]f the wildlife was born in captivity from an egg collected in the wild or from parents that mated or exchanged genetic material in the wild."   *Id.* § 23.34(b)(1) note.

60.     Despite this provision, Defendant's legal acquisition finding regulations, discussed above, *supra* ¶¶ 46-47, state: "For a specimen that is captive-bred or cultivated, we may consider whether the parental stock was legally acquired."   50 C.F.R. § 23.60(e) (this provision is somewhat redundant because the general legal acquisition finding regulations refers to "parental stock," *see supra* ¶ 46 (quoting 50 C.F.R. § 23.60(b)).

61.     Thus, there are specific conditions under which a U.S. citizens must demonstrate that a specimen was lawfully removed from the wild under domestic or foreign law, such as when one is trading a wild-caught specimen or the offspring of parents that bred in the wild.  *See* ¶¶ 56-58.

62.     In other instances, Defendant may be required by treaty to determine if a specimen and its parents where legally acquired, such as when conferring with the Management Authority of an exporting nation regarding a particular shipment, *see supra* ¶¶ 48-51, or when issuing a CITES export document.  *See supra* ¶ 47.

63.     "When an applicant is asked to provide documentation on the legal acquisition of the parental stock, we are asking that they show that the specimens that were *either* removed

from the wild *or* imported into the United States to establish a breeding operation were legally obtained." 79 Fed. Reg. 30400, 30208 (May 27, 2014) (emphasis added).

64.     Thus, in certain instances, the question is whether the parental stock had been internationally traded in accordance with CITES requirements and a more narrow and discrete set of circumstances in which the original founding stock of a line of captive-bred or bred-in-captivity wildlife has been legally removed from the wild.

**B.     Defendant's General Wildlife Import/Export Regulations**

65.     To import wildlife, regardless of whether it is listed under CITES, all importers must execute and file with FWS a "Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177)." 50 C.F.R. § 14.61.

66.     "Wildlife" is defined as "any wild animal, whether alive or dead, including without limitation any wild mammal, bird, reptile, amphibian, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate, whether or not bred, hatched, or born in captivity, and including any part, product, egg, or offspring thereof." 50 C.F.R. § 10.12.

67.     Thus, when the term "wildlife" is used in the regulations, it is focused on a particular specimen and, in some contexts, its offspring.

68.     If the wildlife is imported for commercial use, the importer must have a commercial import/export permit. *Id.* § 14.91(c)(7). No license is required to import wildlife as a pet or for personal use. *Id.* §§ (5),(6).

69.     Subject to certain exceptions, wildlife may only be imported through a designated port. *Id*. §§ 14.11 & 14.12(b),(l).

70.     In order to obtain clearance of imported wildlife specimens, a person must make available to an FWS or Customs agent:

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          Page 13**

(1) All shipping documents (including bills of lading, waybills and packing lists or invoices);

(2) All permits, licenses or other documents required by the laws or regulations of the United States;

(3) All permits or other documents required by the laws or regulations of any foreign country;

(4) The wildlife being imported or exported; and

(5) Any documents and permits required by the country of export or re-export for the wildlife."

*Id.* § 14.52(c).

71.     The requirement enumerated in paragraph 14.52(c)(3), relating to permits and documents "required by the laws or regulations of any foreign country," has been part of the Defendants regulations since 1980.  *See* 45 Fed. Reg. 56668, 56676 (Aug. 25, 1980).

72.     At the time this regulation was enacted, Secretary's designee FWS explained it was a loosening of existing rules in that "documentation is no longer required to show that wildlife has been lawfully taken in the country of origin, when that country does not require any permit or document."  *Id.* at 56670.

73.     "Country of origin" is defined as "the country where the animal was taken from the wild, or the country of natal origin of the animal."  50 C.F.R. § 10.12.

74.     Thus, for captive-bred wildlife born in a country which does not require its citizens to obtain a permit or other documentation to export such wildlife to the United States, no documentation is required of U.S. importers under this provision.

75.     The requirement set forth at paragraph 14.52(c)(5), relating to "documents and permits required by the country of export or re-export for the wildlife," was added to Defendant's regulations in 1996.  *See* 45 Fed. Reg. 31850, 31869 (June 21, 1996).  "Re-export

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          Page 14**

means to send, ship, or carry out of a country any specimen previously imported into that country, whether or not the specimen has been altered since import."  50 C.F.R. § 23.5.

76.     When this provision was proposed, the language was entirely different.  The language in the proposed rule would have required importers and exporters to provide "[a]ny documents and permits required by the country of natal origin of the wildlife" of each wildlife specimen being imported.  45 Fed. Reg. at 31858.

77.     The provision was changed in response to comments objecting to the requirement due to "problems in establishing the 'country of natal origin' of wildlife."  *Id.*

78.     Other objections included the following:

> Some respondents were concerned about potential challenges to foreign permits and the procedures that would become necessary to establish the validity of such permits and other documentation.  Many importers expressed concern with "country of natal origin" requirements and believed that it would often be impossible to determine what documentation was required.  Several respondents anticipated problems in obtaining the required documentation and were concerned that shipments may be detained and seized under the procedures specified in § 14.53(a).

*Id.*

79.     FWS explained that by "proposing to require documentation from the 'country of natal origin' the Service was attempting to address the enforcement concern of wildlife being unlawfully exported from an originating country in violation of an existing ban on exports, or in violation of a foreign law designed to regulate the export of such wildlife, and its subsequent re-exportation from a secondary country to the United States."  *Id.*

80.     However, Defendant's designee rejected the original formulation because it found "that determining the natal origin and requiring documentation for each successive importation and re-exportation of wildlife may impose an unreasonable burden on importers and Service

personnel" and that the new language would "allow the public to more easily determine when they have met the requirements imposed by CITES or of foreign law." *Id.*

81.     Thus, the Defendant had determined that "it would be unreasonable to require country of natal origin documentation with every importation, especially in the absence of reasonable suspicion of unlawful export from the country of natal origin," *id.* at 31859, but she reserved the right to seek proof of the country in which an imported specimen was born or hatched if circumstances warranted.

82.     Defendant knows how to specify conditions under which it may request documentation of a lawful export of founder stock, as demonstrated by her CITES regulations, discussed above.

83.     Moreover, Defendant has rejected a requirement to require proof of the country of natal origin of imported and exported specimens on the grounds that providing such in every instance would impose an unreasonable burden on both domestic importers and FWS itself.

84.     Clearly, a requirement of documentation of a transfer of the founder stock as between two foreign nationals that may have occurred decades earlier would represent an exponentially greater burden than asking for documentation showing proof of where a particular captive-bred specimen being imported was born.

85.     No general regulation requires importers to provide permits or documents demonstrating a lawful export of imported wildlife's ancestors from the country where the founding stock was removed from the wild to another foreign nation.

C.       **The Lacey Act**

86.      The Lacey Act, 16 U.S.C. Chapt. 53, *inter alia*, defines circumstances in which violations of federal, state, tribal, and foreign wildlife laws can lead to federal criminal and civil liability.

87.      Among other things, makes it unlawful to "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce— (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." *Id*. § 3372(a)(2).

88.      The Lacey Act, as do Defendant's regulations, *see supra* at ¶ 65, defines "fish or wildlife" as "any wild animal, whether alive or dead, including without limitation any wild mammal, bird, reptile, amphibian, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate, whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof." 16 U.S.C. § 3371(a).

## FACTUAL ALLEGATIONS

89.      On information and belief, beginning at some point in early 2017, agents with Defendant's designees in the Department of Interior's Office of Law Enforcement ("OLE") began detaining imports of certain captive-bred wildlife and asking domestic importers to provide proof of a lawful export from the country to which specimens' ancestors are endemic to another foreign nation in which subsequent generations were bred.  (Decl. of Philip W. Goss ("Goss Decl."), ¶¶ 10-11 (*appended hereto as* Exh. 1).)

90.      These detentions and seizures have been applied to both CITES-listed species (accompanied by CITES documentation issued by the exporting nation) and non-CITES species. (*Id.* ¶ 12.)

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF       Page 17**

91.     In each case, the domestic importer had provided all documentation required by Defendant under the regulations discussed above.  (*Id.* ¶ 11.)

92.     The first instances of such detentions appeared to be confined to the designated port of Miami and other designated ports within the OLE's Southeastern Region and initially involved exports from European countries of species endemic to Australia and Brazil, as detailed below.  (*Id.* ¶ 15.)

93.     In many cases, specimens of the same species were being cleared at other designated ports by OLE officers.  (*Id.* ¶ 16.)

94.     These detentions were predicated on the Lacey Act, specifically on the basis that the country to which the species is endemic (as to opposed to the imported specimen's country of natal origin and export) had at some point in its history adopted laws and regulations regarding export of its native wildlife.  (*Id.* ¶ 44; *see also* Decl. of Stephen Sykes ("Sykes Decl."), ¶¶ 16-17, 27, 32 (*appended hereto as* Exh. 2).)

95.     For example, Australia implemented a general law barring export of native vertebrate wildlife without a permit in 1982.  Wildlife Protection (Regulation of Exports and Imports) Act of 1982 (Austrl.) § 21(b), *available at http://classic.austlii.edu.au/au/legis/cth/num _act/wpoeaia1982578/*.

96.     Brazil instituted a law limiting export of wildlife to certain legalized species and to those who are licensed in 1967, *see* Wildlife Protection Law of 1967 (Law No. 5,197/67) Art. 3rd, *available at* http://www.planalto.gov.br/ccivil_03/leis/ L5197.htm, and prohibited the export of wildlife without a permit in 1998.  Crimes Against the Environment, (Law No. 9,605/98), Art. 29§ 1(III), *available at* https://www.planalto.gov.br/ccivil_03/leis/L9605.htm.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF        Page 18**

97.     These seizures appear to be predicated on an assumption that the original founder stock's export from the country from which it was taken from the wild to another foreign country was unlawful unless the U.S. importer can produce an export permit or other documentation of that original transaction between two foreign nationals.  (Goss Decl. ¶ 23.)

98.     Such documentation is not currently required by Defendant's regulations.  *See supra* at ¶¶ 82-85.

99.     Over the course of the following five years, the demand for proof of a lawful export between two foreign countries appears to have become a uniform national policy and is being applied to an increasing number of countries, although Defendant has not undertaken a rulemaking required by the APA to amend existing regulations.  (Goss Decl. ¶¶ 18-19, 41.)

100.    In 2022, for the first time of which Plaintiff is aware, this rule was employed to deny a U.S. citizen the ability to export specimens that were bred from previously imported founder stock.  (Sykes Decl. ¶¶ 14-22.)

101.    In one instance, FWS requested documentation of the lawful trade in the direct ancestors of a common gecko (*Eurydactylodes vieillardi*), a species native to New Caledonia, when the shipment was presented to FWS for inspection prior to export.  (Sykes Decl. ¶ 14-17, 25.)

102.    The breeders who produced the domestic captive-bred *E. vieillardi* could not trace the lineage of the seized specimen due to numerous trades and the large number of offspring produced over time. (*Id.* ¶ 18.)  However, the exporter gave FWS copies of an export authorization and collection permit given to two herpetoculturists by New Caledonian government officials allowing them to take this and other species.  (*Id.* ¶ 21.)

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**        **Page 19**

103.    Those herpetoculturists were collecting specimens for research and to breed them in captivity.  New Caledonian officials' only condition was that the wild-collected specimens could not be sold but did allow sales of their offspring.  (Decl. of Phillippe de Vosjoli ("de Vosjoli Decl."), ¶¶ 9-10, 24-25 (*appended hereto as* Exh. 3).)

104.    European herpetoculturists were likewise given similar collection permits and have begun lines of various gecko species from New Caledonia there.  (*Id.* ¶¶ 28-31.)

105.    In a second incident, the same U.S. exporter sent FWS officials an email listing reptiles he intended to export from San Francisco on July 15, 2022, including Indian leopard geckos and Iranian leopard geckos, both non-CITES listed species.  (Sykes Decl., ¶¶ 26-27.)

106.    In response to a request by FWS to produce the original import documents for these two species, the exporter explained that he had been breeding these geckos for 10 to 15 years and had exported them on numerous occasions but did not have the import documentation for the specific ancestors of the specimens being exported.  (*Id.* ¶ 28.)

107.    Further communications with the government agents revealed that FWS was seeking "proof of legal export of the parent stock from their range country" before they would authorize the export of these animals.  (*Id.* ¶ 31.)

108.    Iranian leopard geckos are indigenous to Iraq, Iran, Turkey, and Syria.  Indian leopard geckos are native to India and Bangladesh.  The parental stock for these animals, however, was lawfully imported from European captive-bred stock.  (*Id.* ¶ 33.)

109.    Because the exporter was unable to produce such documentation, he did not include these species in the shipment and has not shipped any of these species since despite continuing demand.  (*Id.* ¶ 36.)

110.    FWS never indicated which of these countries may have restrictions or permitting requirements, unlike the case of the *E. vieillardi* when the agents apparently incorrectly indicated that the New Caledonian government had never allowed their export for commercial breeding purposes.  (*Id.* ¶ 34.)

111.    Plaintiff is unaware if any or all these countries have prohibitions or export licensing requirements for native wildlife or how they may have evolved over time.  (*Id.* ¶ 35.)

112.    The generic request for proof of a lawful export from any one of several foreign nations in the case of the Iranian leopard geckos without so much as an allegation that any one of these nations have wildlife export controls demonstrates that the parental stock policy has become a general regulatory requirement rather than a matter of specific instances of wildlife law enforcement.

113.    In fact, one Special Agent for FWS indicated that "the Inspector program has changed significantly since I left and has been receiving increasingly more guidance from headquarters in an effort to increase consistency across the nation."  (Sykes Decl. ¶ 39.)

114.    In another instance, FWS seized a species of tarantula, *Phormingochilus arboricola*, endemic to the island of Borneo but inhabiting areas under the jurisdiction of both Malaysia and Indonesia.  The specimens were captive-bred in Germany, from which they were imported.  (Decl. of Patrick Byars Corcoran ("Corcoran Decl."), ¶¶ 4-5, 7-9 (*appended hereto as* Exh. 4).)

115.    The seizure was predicated on a violation of Malaysian law and, as in all other instances described herein, the importer was unable to produce any documentation showing the export of their parental stock from Borneo to Germany (or another foreign nation).  (*Id.* ¶ 7.)

116. On information and belief, however, Indonesia has no wildlife export or permitting requirements. (*Id.* ¶ 10.) Thus, FWS' policy seeks information which may not even exist for there to have been a lawful transaction in the founder stock of this species of tarantula.

117. This new requirement is arbitrary and capricious for several reasons.

118. For one, this rule does not account for transactions in which the original founding stock was exported to another nation for captive breeding prior to a nation's adoption of permit regulations or other legal restrictions on export or use of native wildlife. (Goss Decl. ¶¶ 24-25.)

119. Moreover, offspring of the original founding stock is frequently exported to other nations to begin a new line of captive-bred wildlife, the offspring of which may be traded to yet another country to begin yet another new line. Multiple generations, bred over many decades in several different countries may separate a specimen imported to the United States from the original founder stock. (*Id.* ¶¶ 25, 29.)

120. Even where nations may have requirements relating to import and export documentation, they may, like the United States, have limitations on how long such records must be maintained. In the United States, most paperwork must only be retained for five years. (*Id.* ¶ 27.)

121. There are other means by which specimens of wildlife may be legally exported or taken from a particular country and subsequently produce captive bred offspring that may be legally traded. The parental stock may have been exported for scientific purposes, as in the case of the *E. vieillardi* discussed above. *Supra* ¶¶ 101-104; (*see also* Goss Decl. ¶¶ 31-32.)

122. Also, many, if not most countries, allow citizens to emigrate with their personally-owned wildlife, which may then be bred or traded to breeders in third countries to start new lines. (Goss Decl. ¶ 38.)

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          Page 22**

123.    Moreover, under CITES and domestic law, seized specimens that have been illegally trafficked (and thus their offspring) may enter legal trade under certain conditions. (Goss Decl. ¶¶ 33-36.)

124.    In sum, there are numerous, lawful ways parental stock can begin new lines of captive-bred generations for which there is no paper trail or legal requirement to have maintained the original documentation.

125.    The implementation of this policy has caused USARK and its members injury.

126.    For one, the organization and its members have suffered a procedural injury by being forced to comply with a regulation of which they had no notice and on which they were denied the opportunity to comment and raise concerns such as those outlined above.

127.    The new rule also causes financial harm.  Wildlife importers and exporters are unable to continue trading an increasing number of species that have long been marketed and for which there is continuing demand.  (Sykes Decl. ¶¶ 41-46; Goss Decl. ¶ 45; Corcoran Decl. ¶ 12.)

128.    Finally, this rule, based as it is on a theory of potential (if supposed) unlawful transactions between foreign nations and actors, is causing anxiety and placing citizens engaged in a lawful business reasonable fear that they may be subject to seizures and potential criminal and civil penalties.  (Goss Decl. ¶ 44; Sykes Decl. ¶ 45.)

129.    Such injury will continue unless relief is provided by this Court.

## <u>CAUSE OF ACTION</u>

130.    This case involves Defendant's adoption and enforcement of a new substantive legislative rule without adherence to procedure required by law.

131. This new rule is also arbitrary and capricious within the meaning of the Administrative Procedure Act.

132. Plaintiffs are harmed and will continue to suffer substantive and procedural injuries by the unlawful actions complained of herein unless rectified by this Court.

### COUNT ONE
### (APA, Failure to Adhere to Required Procedure)

133. Plaintiffs allege paragraphs 1 through 132 as if they were set forth in full herein.

134. The APA provides for judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id*. § 702.

135. The Department of Interior is an "agency" under the APA.  5 U.S.C. § 551(A).

136. The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

137. The "parental stock policy" is a rule subject to rulemaking procedures within the meaning of the APA because it is an agency statement particular applicability and future effect designed to implement, interpret, or prescribe law or policy, specifically, a policy of requiring the provision of specific information in order to engage in the import and export of wildlife.

138. In order to implement such a rule of general applicability the Secretary must comply with the APA process for notice-and-comment rulemaking. 5 U.S.C. § 553.

139. Defendant has failed to adhere to these procedures when promulgating the parental stock policy rule.

140.    This violation has caused and will continue to cause Plaintiff injury unless relief is granted by this Court.

## COUNT TWO
## (<u>APA, Arbitrary and Capricious</u>)

141.    Plaintiffs allege paragraphs 1 through 140 as if they were set forth in full herein.

142.    The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

143.    The "arbitrary and capricious" standard of the APA's scope of judicial review allows a court to overturn a regulatory decision "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, (1983).

144.    The Secretary's actions in promulgating the parental stock policy rule are arbitrary and capricious because it subjects Plaintiff's members to forfeiture and other civil or criminal penalties based on an inability to provide information or documentation that may not even exist and which is, in virtually every instance, impossible to obtain.

145.    Defendant's unlawful rule also arbitrary and capricious because it relies on a presumption of illegality in the absence of any reasonable suspicion of criminal activity or

probable cause that a particular specimen is the offspring of wildlife taken in violation of the laws of any nation.

146.    This arbitrary and capricious action has caused and will continue to cause Plaintiff injury unless relief is provided by this Court.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

(a)    declaring that the Defendant's "parental stock" policy is a rule adopted without procedure required by law;

(b)    declaring this rule to be arbitrary and capricious within the meaning of the APA;

(c)    vacating the unlawful rule and remanding the matter back to Defendant for further procedures required by law;

(d)    enjoining the Defendant from enforcing the unlawful "parental stock" policy rule;

(e)    requiring Defendant to return any wildlife seized from USARK members under the unlawful rule to its rightful owner;

(f)    awarding Plaintiffs their costs and attorneys' fees as appropriate; and

(g)    granting any such other relief as is just and proper.

Dated:  February 24, 2023                    Respectfully submitted,

*Shaun M. Gehan*
Shaun M. Gehan
D.C. Bar No. 483720
The Law Office of Shaun M. Gehan
1101 30th Street, N.W., Suite 500
Washington, D.C.  20007
Telephone: (202) 412-2508

*Attorney for Plaintiff*